UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN
MADISON DIVISION

JONATHON E. WANISH,           )
                              )
      Plaintiff,              )
                              )
v.                            )     Case No. 3:12-CV-210-JD
                              )
CAROLYN W. COLVIN,            )
COMMISSIONER OF SOCIAL        )
SECURITY,[1]                  )
                              )
      Defendant.              )

**MEMORANDUM OPINION AND ORDER**

Claimant, Jonathon E. Wanish (Wanish), filed a complaint on March 26, 2012 (DE 1) seeking review of the final decision of the Defendant, Commissioner of Social Security (Commissioner).  With the filing of the opening brief (DE 10), response brief (DE 14), and reply brief (DE 17) this matter is ripe for ruling.

**I. PROCEDURAL HISTORY**

Wanish filed for disability insurance benefits (DIB) on June 6, 2008, claiming he became disabled as the result of a motor vehicle accident on December 7, 2007. (R. 122-3) Wanish is insured for purposes of entitlement to DIB until December 31, 2013. (R. 131) Wanish's application for benefits was denied on November 19, 2008. (R. 73) After reconsideration, the application was again denied on May 12, 2009. (R. 78) On June 26, 2009, Wanish filed a request for an administrative hearing (R. 82), and a hearing was held on October 22, 2010, in front of Administrative Law Judge (ALJ) Lawrence D. Wheeler. (R. 39-70) On November 4, 2010, the ALJ rendered a decision concluding that Wanish was not disabled under the meaning of the

---

[1]      Carolyn W. Colvin became the acting Commissioner of Social Security on February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), Colvin is substituted for Michael J. Astrue  as the Defendant in this action.  No further action needs to be taken as a result of this substitution. 42 U.S.C. § 405(g) ("[a]ny action instituted in accordance with this subsection shall survive notwithstanding any change in the person occupying the office of Commissioner of Social Security or any vacancy in such office.").

Social Security Act because he retained the residual functional capacity (RFC)[2] to perform jobs that existed in significant numbers in the national economy.  (R. 20-34). Wanish filed a request for review on December 8, 2010 (R. 19), which was denied by the Appeals Council on January 20, 2012. (R. 1-6)  On March 26, 2012, Wanish filed a complaint, which was transferred to this Court, requesting review of the Commissioner's final decision. (DE 1) Jurisdiction is established pursuant to 42 U.S.C. § 405(g).

In his appeal, Wanish's counsel focuses on the ALJ's failure to consider Dr. Floren's opinion (reached after conducting a comprehensive occupational medical examination and assessment of Wanish on November 5, 2009); failure to deem Wanish's depression a severe impairment and reliance on state agent opinions which were rendered prior to the worsening of Wanish's depression; and failure to properly assess Wanish's credibility. (DE 10 at 9-13) For the reasons detailed below, the Court agrees that the ALJ's failure to consider and weigh Dr. Floren's opinion requires remand.

## II. FACTS

Wanish was born on December 24, 1970 and has completed high school. (R. 122, 144) He previously worked as a truck driver from 1994 to December 6, 2007. (R. 140)  He was 37 years old when he filed for disability benefits and 39 years old at the time of the ALJ's decision. (R. 122, 34)

## A.    Impairments

### 1.    *Medical Evidence from 2007-2008*

On December 7, 2007, Wanish was hospitalized for five days at Luther Hospital after being involved in a motor vehicle accident during which Wanish was thrown from the vehicle

---

[2]        Residual Functioning Capacity is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting.  20 C.F.R. § 404.1545(a)(1).

and sustained multiple injuries including brain injury, and fractures to his 9th and 12th ribs, left lumbar 1-4 transverse processes, left pubic rami (superior and inferior), and left acetabular margin, and he suffered from a splenic laceration and a perforated left tympanic membrane. (R. 191-2, 265-321)

He was then admitted to Sacred Heart hospital on December 11, 2007 for rehabilitative services, at which time he could tolerate only minimal movement and was showing cognitive problems. (R. 191-92, 196-97) Wanish was later discharged on December 24, 2007, from Sacred Heart Hospital where it was noted that he went from being non-ambulatory, to being able to walk 400 feet with a wheeled walker.  He had also become independent with his activities of daily living, although he took extra time to complete them and was hindered by pain. He further showed improvement in regards to his cognitive skills. (R. 194-95)

During Wanish's recovery, he sought treatment from physiatrist Dr. Loftsgaarden and certified physician's assistant Stephanie Raap. (R. 209-84).  Ms. Raap noted that upon initial evaluation in January 2008, Wanish was experiencing flashbacks regarding the accident, he was taking Vicodin for pain, and he was assessed as having adjustment disorder with depression and insomnia. (R. 271)  In March, Dr. Loftsgaarden opined that Wanish might be able to return to work in a couple of months, but in the long run his trucking job may not be the best for him given his knee problems and early onset of osteoarthritis in his left hip. (R. 250)  In August, Dr. Loftsgaarden noted that Wanish's fractures were healing and Wanish could gradually increase his activity, although Wanish continued to suffer from head pressure and used a cane for long distances. (R. 414-15).

As of April 28, 2008, an x-ray of Wanish's left hip revealed that he had progressive healing of the fractures in the superior and inferior public rami and no change in the diastasis of

the pubic symphysis. (R 219-20).  Dr. Ihle, one of Wanish's treating doctors (R. 204-84), indicated that while Wanish was making small improvements, things were going slow. (R. 221-22) Wanish was limited to sitting in a car for about 40 minutes, he could not walk far due to discomfort, and he could do very little bending or lifting.  Dr. Ihle did not believe Wanish would ever have a full recovery.  In July, it was noted that Wanish presented with complaints of mild groin pain, low back pain, and pressure to the left side of his head. (R. 417-19) It was noted that it could take up to two years for Wanish to have maximum improvement from his injuries.

On August 14, 2008, treating doctor, Dr. Robert Peck, who was seeing Wanish on a monthly basis, reported diagnoses of: recurrent major depression, post-traumatic stress disorder (PTSD) and back pain disorder. (R. 201)  Dr. Peck reported that Wanish had mild to moderate symptoms of sad mood, low energy, decreased concentration/focus, and isolation. (R. 202) Wanish's depressive symptoms were accompanied by "ongoing severe chronic back pain." (R. 202)  Dr. Peck further reported that Wanish's PTSD symptoms inhibited Wanish's driving, and his avoidant and numbing symptoms impacted his social interactions and stress tolerance. (R. 202) Wanish's daily activities were noted to be significantly restricted and it was documented that he was unable to work given his back injury. (R. 202) Additionally, it was reported that Wanish had limited contact with other people and was mostly homebound (R. 202-03).

Wanish was also referred by Dr. Jay Loftsgaarden to physical therapy and occupational therapy. (R. 204-84, 421-25) Wanish was seen for eight physical therapy visits at Midelfort Clinic which were completed by August 13, 2008.  His discharge summary indicates that he was feeling a bit stronger, but he continued to have problems with his pain. (R. 423) Additional Midelfort Clinic behavioral notes from October 16 to December 22, 2008, reveal that Wanish returned for a treatment plan review session for his moderate recurrent major depressive

disorder, PTSD in remission, and history of back pain. (R. 562-70) Wanish continued to suffer from a "moderate range of depression" and a "great deal of worry." (R. 569) Records from November 19, 2008, show that Wanish was 50% of the way towards reducing or eliminating panic when at the site of his accident; he was able to drive during the day but was still quite anxious about driving at night; and, he had begun to sleep through the night. (R. 566-67)

On November 10, 2008, state agent Syd Foster, D.O., completed a physical RFC assessment, opining that Wanish was able to lift up to 10 pounds occasionally and less than 10 pounds frequently, sit about 6 hours and stand/walk at least 2 hours in an 8 hour workday, and was able to push/pull without limitation. (R. 372-79) Foster opined that Wanish had no postural, manipulative, visual, communicative, or environmental limitations.  Foster remarked that Wanish had an antalgic gait but only used a cane if ambulating long distances, was morbidly obese with a body mass index of 43, and continued to experience chronic pain.  He found Wanish's statements regarding his symptoms and their functional impact to be partially credible.

On November 19, 2008, state agent, Kyla King, Psy.D., completed a mental RFC assessment and a psychiatric review technique form. (R. 380-97)  Dr. King reported that Wanish was not significantly limited in his understanding and memory or his ability to socially interact, but relative to maintaining sustained concentration and persistence, he had moderate limitations with his ability to carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule; maintain regular attendance and be punctual; and sustain a normal work-day and work-week without interruptions from psychologically based symptoms and perform at a consistent pace without an unreasonable number of breaks.  Wanish was found to be moderately limited in his ability to respond appropriately to changes in the work setting.  Dr. King reported, "I find the claimant's

statements regarding his symptoms and their effect on his functioning to be fully credible."
Despite Wanish's having moderate problems sustaining concentration, pace, and persistence due
to psychological symptoms and pain, Dr. King believed Wanish was able to meet the basic
mental demands of unskilled work.

In his psychiatric review technique, Dr. King opined that Wanish suffered from anxiety
syndrome (marked by recurrent and intrusive recollections of a traumatic experience which were
the source of distress) and depressive syndrome (marked by sleep disturbance, decreased energy,
feelings of guilt or worthlessness and difficulty concentrating or thinking).  Dr. King noted that
Wanish had no restrictions with performing activities of daily living, mild difficulty maintaining
social functioning, moderate difficulty maintaining concentration, persistence and pace, and no
episodes of decompensation. There was no evidence establishing the presence of "C" criteria (R.
394-95)

Thereafter, psychotherapy notes from December 3, 2008, show Wanish thinking about
the upcoming one year anniversary of his accident (R. 564), and it was noted that he seemed to
be doing pretty well with respect to his PTSD. (R. 565) On December 22, 2008, Dr. Peck
reported that Wanish's medications would continue at Trazodone 50 mg., at bedtime, and
Fluoxetine 40 mg., once a day. (R. 563) Dr. Peck also noted that Wanish walked with a
noticeable limp due to back pain. (R. 562) Wanish's x-ray revealed healing pubic rami fractures
and stable public symphysis separation with extraosseous densities possibly representing fracture
fragments (R. 410). Dr. Ihle discharged Wanish from his orthopedic care and noted that Wanish
still had problems when he walked a lot or lifted anything over 20 pounds, but Wanish was likely
at a point where formal rehab would be of little help.  Dr. Ihle believed that Wanish's continued
head problems and confusion should be treated by Dr. Peck. (R. 411-12).

2.    *Medical Evidence from 2009-2010*

Wanish continued to receive treatment at the Midelfort Clinic in 2009. (R. 458-88; 525-61).  Of particular interest, notes from January 27, 2009, show that Wanish discontinued taking his medications for about a week and a half because he was feeling fatigued and gaining weight. As a result of not taking his medicine, he became unmotivated, anxious, and began relapsing into a depressive condition. (R. 558)  Notes from February 2009, reflect that Wanish continued to have low back pain, but it helped to use his cane when walking long distances. (R. 405-08, 486-87, 554). Wanish also continued to have pressure in the left side of his head, trouble with cognition, and problems with significant weight gain, but he denied any problems with his vision, balance, or shortness of breath. *Id.*  It was Dr. Loftsgaarden's opinion that if it were not for Wanish's depression and anxiety, he could probably perform sedentary work. *Id.*

In April, Wanish was continuing to struggle with problems associated with moderately severe depression and pressure in the left side of his head. (R. 50-52)  Dr. Willson-Broyles of the EU Midelfort Clinic noted that Wanish was more accepting to having to adjust his life to accommodate his injury—by way of example, Wanish was resistant to using a cane, but after noticing that his back hurt without it, he decided to follow Dr. Loftsgaarden's advice by using the cane. *Id.*

On May 4, 2009, state reviewing agent Dr. Michael Baumblatt, M.D., affirmed Dr. Foster's physical RFC assessment dated November 10, 2008, and state reviewing agent Dr. Eric Edelman, Ph.D., affirmed Dr. King's psychiatric review technique and mental RFC assessment dated November 19, 2008.

In July 2009, Wanish was more tearful and angry about the loses in his life, and he was diagnosed with having moderate recurrent major depressive disorder and adjustment disorder

with mixed anxiety and depressed mood. (R. 540-42)  In August 2009, Dr. Peck diagnosed

Wanish with recurrent major depression and back pain, and he renewed Wanish's same

medications from April 2009. (R. 536-37)  Dr. Peck reported that Wanish used a cane and

"look[ed] to be noticeably uncomfortable getting up walking from [the] waiting room to my

office." (R. 536) Wanish related that pain was still an issue. *Id.* In September 2009, Wanish

seemed to be doing better (R. 532-33), but in October 2009, he looked depressed and angry. (R.

530)

On October 13, 2009, while at the Midelfort Clinic, Wanish reported pain in the

paraspinous muscles on the left side of his spine continuing down into the sacroiliac joint of his

left upper buttock. (R. 479)  He had very guarded movements, especially when going from a

seated position to a standing position.  He walked with a cane and occasionally had some

paresthesias down into his left leg and left buttock area. (R. 479) Wanish was assessed with

having chronic low back, hip, and pelvis pain secondary to his accident, in addition to

depression, insomnia, obesity, atypical chest pain and history of mild traumatic brain injury. (R.

481)  Wanish reported having severe back pain 5-7 times each month, at which point he took

Vicodin rather than high doses of ibuprofen.

Results of Wanish's neurology consultation by Dr. David Nye on October 15, 2009,

showed that the range of motion in his back was "quite limited" and he suffered from pain in his

back and hips. (R. 474-5)  On November 5, 2009, Dr. Andrew M. Floren, M.D., an occupational

health physician, conducted an occupational consultation at the request of Ms. Raap to report

Wanish's necessary work restrictions. (R. 468-472)  Dr. Floren reported that after reviewing

Wanish's medical records and examining Wanish, it appeared that his symptoms had been stable

for some time, and included at least a 6 out of 10 burning pain in the left low back, left hip, left

pelvis area, and left buttock, which became worse with motion and better with rest. *Id*.  Wanish had an antalgic gait favoring his left leg when using a cane (which helped decrease the pain), and had some difficulty rising from a chair.  He also had a great deal of difficulty crouching. *Id*. Dr. Floren noted that Wanish's x-rays from February 2008 showed healed fractures though not in perfect alignment in the pelvis. *Id*.  Dr. Floren believed that Wanish's motor vehicle accident resulted in Wanish's suffering from a closed head injury with apparent cognitive defects; depression; post-traumatic stress disorder; and multiple transverse process and pelvic fractures with chronic low back and hip pain. (R. 471) Dr. Floren believed that Wanish would need work restrictions based on his cognitive abilities, PTSD, and depression (but deferred to the mental health specialists concerning those limitations), and opined that Wanish required "permanent work restrictions based on physical limitations" including not working more than two hours a day, not lifting more than twenty pounds, not climbing ladders or bending, and only rarely kneeling, squatting, crouching or twisting. (R. 472)

On November 10, 2009, Wanish was examined by neuropsychologist Paul M. Caillier, Ph.D. (R. 432).  Dr. Caillier reviewed medical records, conducted a clinical interview with Wanish and his mother, and administered various test protocols. (R. 432-35)  Dr. Caillier reported that Wanish had suffered a mild brain injury that had evolved into a depressive disorder and PTSD. (R. 435) Although the PTSD had largely resolved, the depression had not and was characterized by anhedonia, sleep disturbance, psychomotor agitation, decreased energy, and feelings of guilt, worthlessness, helplessness, and hopelessness. (R. 435-36) Dr. Caillier found that Wanish had difficulty concentrating and thinking, had a reduced intelligence in the borderline range with commensurate achievement and memory, and suffered from considerable pain which was present the majority of the time. *Id*.  Dr. Caillier believed Wanish was disabled

from competitive employment, and explained that because of his intelligence problems, depression, achievement levels, problems with attention, concentration, and memory, as well as his reduced ability to maintain persistence and pace, Wanish would be ineffective in a job situation. (R. 436)

A lumbar spine MRI taken on December 1, 2009, revealed degenerative disc disease with a small focal central disc protrusion at L5-S1. (R. 496)  Mild degenerative changes of the posterior facet joints L5-S1 were also noted. (R. 496-97)  Dr. Nye reported that the findings in the MRI were the cause of some of Wanish's back pain, but Wanish's conditions were not amenable to surgery. (R. 462)  On December 2, 2009 and January 13, 2010, Wanish reported to Dr. Loftsgaarden and  Ms. Raap that his pain was a level 4 on a 10 point scale, but his pain did get as high as a level 10. (R. 460) Wanish continued to have lower lumbar back pain and decreased strength in his lower left extremity. *Id.*  Wanish's medical records show that he was consistently taking ibuprofen and Vicodin for pain, Trazodone for sleep, Sertraline for depression, and Famotidine for reflux disease.

Wanish continued to seek treatment through 2010 for his ongoing medical conditions including his chronic hip and back pain, decreased lower left extremity strength, obesity, depression, PTSD, and cognitive problems. (R. 437-48, 489-524).  In August 2010, Wanish reported that he had again been having nightmares about the accident, and his medical records indicate he was more depressed, lacked energy and interest, experienced a decrease in focus and concentration, had interrupted sleep, and suffered from significant back pain even if walking with a cane. (R. 437-38, 501) Wanish seemed dismayed that he was declining after he had been doing well a few months back. *Id.* Midelfort Clinic notes from June 21, 2010, reflect Wanish having one or two severely bad days per month. (R. 439)

**B.      October 22, 2010 Hearing**

*1.      Testimony of Wanish*

Wanish testified he had been using a cane every day for two-and-a-half years and had never replaced the rubber stopper on the bottom. (R. 42)  After Wanish reported that he weighed 290 pounds and was five foot ten inches tall, the ALJ told Wanish that he would have gone through 4 or 5 rubber stoppers in two-and-a-half years if his testimony were accurate. (R. 43) Upon further inquiry, Wanish acknowledged that he used the cane only 2 to 3 times a month, and his doctors advised him to use it for long distances. (R. 44-5) When asked why he was unable to work, Wanish replied that after sitting or standing for a while the pain in his hips and pelvis forced him to lie down. (R. 45-6)

Upon cross-examination by his attorney, Wanish described stress-related pressure in his head on account of his medical problems. (R. 48-9) Wanish also stated that he felt the pressure in his head and felt distracted when around noise or in a crowded room. (R. 49-50) Wanish testified about his nightmares, his anger issues, and his lack of patience with attempting to overcome his learning disability. (R. 52)  Wanish indicated that the bones in his back were not completely healed and he could not do physical work especially involving bending and lifting, but he could "putz" around in his garden. (R. 53) Wanish indicated that he could no longer hunt or fish because he could lift only 10 or 20 pounds. (R. 51)   It was also noted that Wanish's math skills were at a 3.7 grade level, and he had difficult counting money. (R. 56)  Wanish further indicated that he was color blind. (R. 67).

*2.      Testimony of Claimant's Mother*

Ms. Carolyn Wanish testified that she was Jonathan Wanish's mother and that he had been residing with her since February of 2010. (R. 57)  Ms. Wanish and her son are together

most evenings and weekends and she has been helping him since his motor vehicle accident. (R. 57-58) When asked by the ALJ what would prevent Wanish from doing a repetitive assembly job, she replied that Wanish gets frustrated too easily and he has problems sitting and standing. (R. 60-61) Ms. Wanish testified that ever since the accident, her son is more depressed, anxious, and easily frustrated with his inability to perform tasks that he once performed. (R. 63-64).

*3.    Testimony of the Vocational Expert*

The vocational expert (VE) identified Wanish's position as a truck/delivery driver as semi-skilled and medium-strength, per the Dictionary of Occupational Titles, but noted that the job was actually performed by Wanish at the heavy exertional level. (R. 65) The ALJ asked the VE to consider a hypothetical individual of the same age, education, and work experience as Wanish, but added that the individual was limited to sedentary work, the ability to sit or stand at 30 minute intervals as needed, could only occasionally stoop, kneel, crouch, crawl, and climb, and could not climb ladders, ropes, or scaffolds, and could only perform simple repetitive tasks in order to account for mental limitations. (R. 65) The VE testified that someone with those limitations would not be able to maintain Wanish's previous work, but could perform work as an electronics worker (approximately 250,000 positions in the U.S., 215,000 positions in the region, and 15,000 local positions), and a hand packager (approximately 350,000 positions in the U.S. and 25,000 positions in region). (R. 66)

Wanish's attorney then cross-examined the VE regarding the positions identified. (R. 67) The VE confirmed that an electronics worker and a hand packager would be required to keep pace through the entire workday and would have to meet production quotas. (R. 67-68)  The VE also testified that an individual who regularly missed more than 2 days of work a month or who frequently had to leave early or lay down would not be able to keep a job. (R. 68-69)

**C.     Opinion of the ALJ**

The ALJ determined Wanish met the insured status requirements of the Social Security Act through December 31, 2013, and had not engaged in substantial gainful activity since December 7, 2007. (R. 25)  The ALJ found that Wanish had severe impairments of PTSD, obesity, L2-5 transverse process fracture, a left acetabular fracture, and a left public rami fracture. (R. 25)  The ALJ also found that Wanish suffered from difficulty sleeping and a head injury, which were non-severe impairments. (R. 26)

The ALJ  determined that Wanish did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (the Listings). (R. 26) The ALJ considered Wanish's spinal impairment and joint problems under Listing 1.04 and 1.02, and found no sufficient evidence to satisfy either Listing. (R. 26) Further, the ALJ concluded that Wanish's obesity impacted his physical ability, but had not resulted in an impairment adequate to meet any Listing. (R. 26) The ALJ opined that Wanish's mental impairments failed to meet the criteria of Listing 12.04. (R. 26) This was because Wanish had only mild limitations in his ability to perform activities of daily living and engage in social functioning; moderate limitations with maintaining concentration, persistence, or pace; and no episodes of decompensation or evidence establishing the presence of the paragraph C criteria. (R. 27)

The ALJ concluded that Wanish had the RFC to perform sedentary work as defined by 20 C.F.R. § 404.1567(a), except he must be able to sit/stand at 30 minute intervals as he wishes, and he could only occasionally stoop, kneel, crouch, crawl or climb and could not climb ladders, ropes or scaffolds, and could only perform simple repetitive tasks. (R. 27)

The ALJ found that Wanish's medically determinable impairments could reasonably be expected to cause his alleged symptoms, but found that his statements concerning the intensity, persistence, and limiting effects of his symptoms were not credible (R. 26). The ALJ noted that although Wanish had various treatments since his car accident which would normally weigh in his favor, the evidence revealed that his treatments were generally successful in controlling his symptoms from the accident. (R. 28) Additionally, the ALJ found that Wanish's mental impairments did not preclude him from performing at least unskilled work involving simple repetitive tasks. (R. 29-32)

The ALJ determined that Wanish was unable to perform any past relevant work, however jobs existed in significant numbers in the national economy that Wanish could perform considering his age, education, work experience, and RFC. (R. 33)  Considering the VE's testimony, the ALJ concluded that Wanish could successfully perform the work of an electronic worker and a hand packager, and therefore Wanish was not under a disability. (R. 34)

### III. STANDARD OF REVIEW

The decision of the ALJ is the final decision of the Commissioner when the Appeals Council denies a request for review. *Liskowitz v. Astrue*, 559 F.3d 736, 739 (7th Cir. 2009).   In its review, the district court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).  Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).  Thus, even if "reasonable minds could

differ" about the disability status of the claimant, the Court must affirm the Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003).  Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision, and the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Id.*  Ultimately, while the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

Further, conclusions of law are not entitled to deference; so, if the Commissioner commits an error of law, reversal is required without regard to the volume of evidence in support of the factual findings. *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997).

### IV. ANALYSIS

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Social Security regulations create a five-step sequential evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)-(v).  The steps are to be used in the following order:

1.      Whether the claimant is currently engaged in substantial gainful activity;

2.      Whether the claimant has a medically severe impairment;

3.      Whether the claimant's impairment meets or equals one listed in the regulations;

4.      Whether the claimant can still perform relevant past work; and

5.      Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  If the claimant is performing substantial gainful activity or does not have a severe medically determinable impairment, or a combination of impairments that is severe and meets the duration requirement, then the claimant will be found not disabled. 20 C.F.R. § 404.1520(a)(4)(i)-(ii).  At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii).  However, if a Listing is not met or equaled, in between steps three and four, the ALJ must then assess the claimant's RFC, which is used to determine whether the claimant can perform his past work under step four and whether the claimant can perform other work in society at step five of the analysis. 20 C.F.R. § 404.1520(e).  The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

Wanish contends the ALJ failed to consider the opinion of Dr. Floren, failed to adequately consider his worsening depression, and discredited Wanish's complaints of pain and other symptoms without proper support.

**A.    The ALJ's Failure to Consider Dr. Floren's Opinion**

Wanish first argues that the ALJ erred by failing to consider the opinion of Dr. Floren, an occupational health physician who determined Wanish's work restrictions in November of 2009 after reviewing medical records and examining Wanish. Dr. Floren had also conducted Wanish's Department of Transportation physical in October 2006. (R. 469).

ALJ's are required to consider all relevant evidence in the record in determining whether an individual is disabled. 42 U.S.C. § 423(d)(5)(B).  The relevant evidence to be considered includes opinion evidence from "acceptable medical sources" (such as licensed physicians), medical sources that do not qualify as "acceptable medical sources" (such as nurse practitioners and physician assistants), and non-medical sources (such as former employers). 20 C.F.R. §§ 404.1527(c), 404.1513(d); SSR 06-03p. Consistent with 20 C.F.R. § 404.1502, "acceptable medical source" refers to one of the sources described in § 404.1513(a), which in relevant part includes licensed physicians and licensed or certified psychologists, who provide evidence about a claimant's impairments (whether a treating, non-treating, or non-examining source).  Again, "[r]egardless of its source, [the Social Security Administration] will evaluate every medical opinion." 20 C.F.R. § 404.1527(c). Therefore, unless given controlling weight as a treating source, the factors to be considered in deciding the weight to be given any medical opinion are the examining relationship (with more weight given to an opinion of an examining source); the treatment relationship, which includes the length, frequency, and nature of the treatment; the degree to which the source presents relevant evidence to support the opinion; the consistency of the source's opinion with the other evidence; whether the source specializes in an area related to the individual's impairment; and any other factors tending to support or refute the opinion. 20 C.F.R. § 404.1527(c); SSR 06-03p.

Here, Dr. Floren is a licensed medical doctor, so his opinion and observations must be considered by the ALJ, and the ALJ's decision must explain the weight he attributed to Dr. Floren's opinion.  However, as Wanish argues, and as the Commissioner effectively concedes, the ALJ's decision never explicitly discusses the opinion of Dr. Floren, nor does it contain any explanation of the weight he attributed to Dr. Floren's opinion. The Commissioner argues that this does not constitute error since the ALJ's decision contained numerous references to Exhibit 16F, the portion of the record where Dr. Floren's opinion is located.  The Commissioner believes the citations to Exhibit 16F suggest that the ALJ had considered Dr. Floren's opinion, even if the ALJ did not expressly discuss it in his decision.  The Court disagrees.

Although the ALJ's decision contains just over two dozen citations to Exhibit 16F, the exhibit itself consists of 135 pages.  Dr. Floren's report is found on pages 32-36 of Exhibit 16F. (R. 468-72)  But the ALJ never relies on pages 32-36 of Exhibit 16F, instead, he refers only to pages 1, 3, 6, 11, 13, 39, 50, 59, 61, 69, and 85 throughout his opinion. (R. 26, 28-32)  Moreover, when the ALJ references these particular pages from Exhibit 16F, it is clear that the ALJ cannot possibly be referring to Dr. Floren's assessment because the ALJ is clearly referencing December 2009 MRIs of the claimant's head and lumbar spine and various medical records from Ms. Raap, Dr. Peck, Dr. Loftsgaarden, neurologist Dr. Nye, cardiologist Dr. Naseem, and licensed clinical social worker Mr. Willson-Broyles of the EU Midelfort Clinic.  Thus, despite the Commissioner's position, the ALJ's opinion does not reflect that the ALJ was aware of or had considered Dr. Floren's report which provided his opinion relative to the severity of Wanish's impairments in late 2009 and how they permanently impacted his ability to work. Further bolstering this Court's belief that the ALJ never considered Dr. Floren's report, is the fact that the ALJ's decision specifically identified other medical sources whose opinions he did

consider and provided an explanation for the weight given to each of those opinions.  But again, the ALJ did not reference or acknowledge Dr. Floren or Dr. Floren's assessment. (Tr. 25–28). The ALJ's failure to consider Dr. Floren's opinion and minimally articulate what weight he gave to the opinion and why, prevents the Court from conducting a meaningful review of the decision. *See Walters v. Astrue*, 444 F. App'x. 913, 917 (7th Cir. 2011) ("Of course the regulations do not literally say that ALJs must explicitly mention every doctor's name and every detail in their reports. However, when there is reason to believe that an ALJ ignored important evidence—as when an ALJ fails to discuss material, conflicting evidence—error exists.").  The ALJ's failure to address Dr. Floren's assessment therefore constitutes error.

The Commissioner devotes the remainder of its response on this issue to arguing that remand is unnecessary because Dr. Floren's assessment would not have changed the ALJ's decision. The "harmless error" doctrine is a narrow exception to the rule that an administrative agency's decision can only be affirmed on the grounds relied on by the agency. *Spiva v. Astrue*, 628 F.3d 346, 353 (7th Cir. 2010). When an ALJ commits an error, a court may only affirm the decision "[i]f it is predictable with great confidence that the agency will reinstate its decision on remand because the decision is overwhelmingly supported by the record though the agency's original opinion failed to marshal that support." *Spiva*, 628 F.3d at 353.

The Commissioner argues that the ALJ's error is harmless because the RFC accounted for the bending restriction that Dr. Floren described [DE 14 at 11] (citing *Luna v. Shalala*, 22 F.3d 687, 690 (7th Cir. 1994) ("the ability to bend is not required for sedentary work . . .").  This argument does not violate the *Chenery* principle, since the error would be harmless if Dr. Floren's opinions were already reflected in the RFC. *See SEC v. Chenery Corp.*, 318 U.S. 80, 88

(1943).  However, this argument fails on the facts, since in the RFC, the ALJ only accounted for some, not all, of Wanish's limitations reported by Dr. Floren.

As detailed above, Dr. Floren's report reflects his belief that Wanish would need work restrictions based on his cognitive abilities, PTSD, and depression, and that Wanish required "permanent work restrictions based on physical limitations," which included not working more than two hours a day, not lifting more than twenty pounds, not climbing ladders or bending, and only rarely kneeling, squatting, crouching or twisting. (R. 472)  Thus, while the RFC's inclusion of sedentary work may have accounted for the bending and lifting restriction, the RFC did not include the additional limitations Dr. Floren imposed on Wanish, which included his inability to work longer than two hours per day and limited ability to squat or twist.

The government suggests that the failure to consider the two hour work limitation was not error, because the ALJ would have rejected the opinion anyway because such a limitation would have required a finding that Wanish was disabled—a finding which is reserved for the ALJ. *See* 20 C.F.R. § 1527(e)(1).  However, the government's argument misses the point.  Of course, a medical source's opinion that a claimant is unable to work is not conclusive, and the ALJ is free to discount the opinion of Dr. Floren.  However, the ALJ must at least acknowledge that he was aware of the opinion, considered it, and provide an explanation for why he ultimately rejected it.  Otherwise, the Court has no way of knowing whether consideration of Dr. Floren's opinion might have affected the ALJ's RFC analysis and resulted in a finding that Wanish was actually further limited than the ALJ believed based on the other records.

In addition, the Court is unable to conclude that the agency would likely reinstate its decision on remand even upon consideration of Dr. Floren's report, because it cannot be said that the AJL's decision is overwhelmingly supported by the record.  In fact, the record reveals other

facts not mentioned by the ALJ which might support a finding of disability—for example, Dr. Ihle opined in April 2008 that Wanish would never have a full recovery, and as of late 2008, that Wanish was at a point where formal rehab was of little help; and, Dr. Loftsgaarden indicated in February 2009 that Wanish's depression and anxiety probably prevented him from even performing sedentary work.  The ALJ also omitted any discussion of Wanish's consistent complaints of chronic pain, despite the fact that the record is replete with evidence that Wanish continued to suffer from chronic pain, which was actually documented by various medical sources.  Based on these inconsistencies between the record and the ALJ's opinion, the Court cannot conclude that the ALJ's failure to consider and weigh Dr. Floren's opinion was harmless.

    The Court would also note that to the extent the government is asking the Court to affirm the ALJ's decision regardless of this error because the ALJ would not find Dr. Floren's opinion to be credible, such an argument does violate the *Chenery* principle. *Phillips v. Astrue*, 413 F. App'x 878, 884, 887 (remanding an ALJ's decision where he did not cite any legitimate reason for rejecting a physician's assistant's opinion, even where the court observed that an ALJ "might be skeptical" of the opinion, on the basis that the ALJ had not relied on those grounds). The ALJ did not address Dr. Floren's opinion in his decision, so any argument that he would have discredited his opinion if he had considered it is a "post-hoc rationalization" that the Court cannot consider on appeal. *Id.* at 887. Therefore, because the ALJ erred in failing to consider and weigh Dr. Floren's opinion, and because the Court cannot conclude with great confidence that this error was harmless, this case must be remanded to the Commissioner for further proceedings.

**B.      Depression and Credibility Finding**

Having determined that remand is necessary, the Court need not rule definitively on Wanish's remaining arguments. However, to help ensure that the Commissioner's decision on remand is free from further errors, the analysis on remand should not only consider the neglected report of Dr. Floren, but it should also include an adequate discussion of the limitations caused by Wanish's chronic pain, which was repeatedly documented by his examining doctors who both observed and diagnosed Wanish as suffering from severe chronic pain. The ALJ should then explain whether his consideration of the location, duration, frequency, and intensity of Wanish's chronic pain has influenced his credibility finding, *see* 20 C.F.R. § 404.1529(c), and ultimate RFC assessment.

In addition, on remand, the Commissioner should be sure to sufficiently address Wanish's worsening depression.  Although the ALJ gave significant weight to the opinions of state agents Drs. King and Edelman, these doctors did not review any of Wanish's records post-dating May of 2009.  *See Staggs v. Astrue,* 781 F.Supp.2d 790, 794-96 (S.D. Ind. 2011) (finding that the medical record omitted from review provided "significant substantive evidence" regarding the claimant's medical impairments and that any medical opinion rendered without taking this subsequent record into consideration was "incomplete and ineffective."). And while the ALJ may have mentioned some mental status exam findings from 2009 and 2010 which indicated that Wanish's memory, judgment, and insight were intact (as argued by the Commissioner), he certainly did not mention various other records after May 2009 (as set forth in the factual background of this order and in plaintiff's briefs) which documented the worsening of Wanish's depression and the limitations caused by his mental ailments.  Ultimately, the ALJ's RFC assessment and disability determination must be based on all the relevant evidence in the

record, 20 C.F.R. § 404.1545(a), must include consideration of all the medically determinable impairments, even if not considered "severe," 20 C.F.R. § 404.1545(a)(2), and must be supported by substantial evidence. *Arnett v. Astrue*, 676 F.3d 586, 591 (7th Cir. 2012). On remand, the ALJ shall comply with these requirements with respect to Wanish's mental limitations.

## V. CONCLUSION

For the reasons stated herein, the Court GRANTS Wanish's request to remand the ALJ's decision and the case is REMANDED for further proceedings consistent with the conclusions in this order.

SO ORDERED.

ENTERED:   March 19, 2014

                              /s/ JON E. DEGUILIO
                              Judge
                              United States District Court